**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 24 MAP 2023 |
| | : | |
| Appellee | : | Appeal from the Order of the |
| | : | Superior Court at No. 2099 EDA |
| | : | 2021 dated June 28, 2022, |
| v. | : | reconsideration denied August 31, |
| | : | 2022, Affirming the Judgment of |
| | : | Sentence Entered September 20, |
| JEFF DOBSON, | : | 2021 in the Delaware County Court |
| | : | of Common Pleas, Criminal Division, |
| Appellant | : | at No. CP-23-CR-0001612-2019. |
| | : | |
| | : | ARGUED:  November 30, 2023 |

**OPINION IN SUPPORT OF REVERSAL**

**JUSTICE WECHT**                                    **DECIDED:  January 8, 2024**

Invoking the Fourth Amendment's most venerable principles, the Supreme Court of the United States has ruled that an "individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime."[1]  A person's mere presence in a so-called "high crime" area does not create reasonable suspicion to believe that the individual is armed and dangerous.  These are hornbook principles of the law of search and seizure.  I had thought them beyond dispute.

In the case before us here, the arresting officer testified unequivocally that he frisked a passenger in a stopped vehicle for weapons because he believed that passenger to be armed and dangerous solely due to "the area that [they] were currently

---

[1]    *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (citing *Brown v. Texas*, 443 U.S. 47, 52 (1979) ("The fact that appellant was in a neighborhood frequented by drug dealers, standing alone, is not a basis for concluding that appellant himself was engaged in criminal conduct.")).

in,"[2] an area that the officer previously had described as a "high crime area."[3] This justification plainly fails to comport with Fourth Amendment principles, and was insufficient as a matter of law. The evidence that the officer found (and all the fruit produced by that poisonous tree) should have been suppressed.

The lower courts here found that the totality of the circumstances[4] justified the arresting officer's fear, notwithstanding the officer's actual testimony. As I detail below, none of those circumstances suggested, even remotely, that the passenger was armed and dangerous. I would reverse the Superior Court's contrary conclusion, vacate the convictions, and remand this case for trial without the unconstitutionally obtained evidence.

## I.

On August 19, 2018, at approximately 10:30 p.m., police officer Jerome Duncan was dispatched to the general vicinity of West 6th Street in the City of Chester to investigate a report of shots fired. Officer Duncan arrived at that location within minutes. He observed a maroon sedan pass through a steady red light at the intersection of 7th and Lloyd Streets without stopping. The officer maneuvered his patrol vehicle behind the sedan and activated its emergency lights and siren. The sedan immediately slowed down and began to pull over on the right side of the road. However, there were cars parked along that side of the road, so the sedan did not come to a complete stop. Instead, the vehicle proceeded at a very slow rate of speed along Lloyd Street.

---

[2]     Notes of Testimony ("N.T."), Suppression Hearing, 1/9/2020, at 19.

[3]     *Id.* at 14.

[4]     *See United States v. Cortez*, 449 U.S. 411, 417 (1981) (explaining that, in evaluating whether reasonable suspicion existed to support police action, "the totality of the circumstances—the whole picture—must be taken into account").

Officer Duncan notified police officers nearby that he was attempting to stop the sedan. Responding to the call for assistance, another police officer parked his cruiser in perpendicular fashion on Lloyd Street with its emergency lights activated, blocking passage. Unable to proceed in that direction, the slow-travelling sedan made a right turn into an apartment complex and parked in a demarcated parking space.

After Officer Duncan blocked an entrance to the complex with his cruiser, he saw the driver of the sedan exit the vehicle on his own initiative and speak with another police officer. Two passengers, one of whom would be identified as Jeff Dobson, remained in the vehicle. After ascertaining each person's identity, Officer Duncan learned that the driver's operating privileges had been suspended due to a prior DUI conviction and that the rear seat passenger was the subject of an active warrant. Officer Duncan immediately took the rear seat passenger into custody, and then asked Dobson to step out of the vehicle. Dobson had no active arrest warrants, did not make any furtive movements, did not attempt to flee, did not reach for his waistband, and did not attempt to place something under the seat of the vehicle. In fact, Dobson did not act suspicious or nervous in any way. Nonetheless, Officer Duncan, concerned that Dobson could possibly be "concealing a weapon of any sort,"[5] informed Dobson that he was going to frisk him for "weapons for officer safety."[6] During the ensuing pat-down, the officer "immediately recognized a bulge on [Dobson's] right side right above his knee, a bulge which [the officer] immediately recognized to be a firearm."[7] Once Dobson confirmed that he did not have a license to carry a concealed firearm, Officer Duncan placed him under arrest. At the police station, Officer Duncan asked Dobson if Dobson had any contraband on his person. Dobson

---

[5] N.T. at 18.

[6] *Id.*

[7] *Id.* at 19.

admitted that he had cocaine hidden in his underwear. The officer then recovered that cocaine.

Dobson was charged with carrying a concealed firearm without a license, persons not to possess firearms, possession of a controlled substance, and possession of drug paraphernalia.[8] Prior to trial, Dobson filed a suppression motion challenging the constitutionality of the pat-down and the subsequent seizure of the gun and drugs. At a hearing on the motion, Officer Duncan testified that he stopped the sedan because he had observed it roll through a steady red light. The officer explained further that the traffic violation, even though it occurred at a very slow rate of speed, aroused his suspicions further, in part, because it transpired near the area from which the "shots fired" report emanated. And, the officer asserted, the general vicinity encompassing 6th, 7th, and Lloyd Streets was considered by the police to be a "high crime area" due to "[v]iolent crimes, shootings, [and] shots fired," and was also a "high drug area."[9] Thus, when asked why he believed that Dobson, a mere passenger in the sedan, was armed and dangerous, Officer Duncan candidly testified that this was solely because of "the area that we were currently in."[10]

On February 10, 2020, the trial court denied Dobson's suppression motion. In an opinion accompanying the order that denied the motion, the court found both that the stop of the vehicle was constitutional and that Officer Duncan had independent reasonable

---

[8]   See 18 Pa.C.S. §§ 6106(a)(1) and 6105(a)(1), 35 P.S. § 780-113(a)(16) and (a)(32), respectively.

[9]   N.T. at 14. Officer Duncan testified that his belief that that part of the City of Chester constituted a high-crime area was based, in part, upon his personal experiences and observations, i.e., effectuating arrests and responding to shootings in that vicinity. See id. at 14-15.

[10]   Id. at 19.

suspicion to believe that Dobson was armed and dangerous.[11]  Citing exclusively the nature of the area in which the stop occurred and circumstances pertaining only to the driver and to the rear passenger—not to Dobson—the trial court offered the following explanation as to why it found that Officer Duncan was justified in frisking Dobson:

> Here, Officer Duncan testified he responded to the location because of a report of shots fired received minutes before his arrival.  Officer Duncan observed the vehicle [Dobson] was a passenger in[] travel through a steady red light.  When Officer Duncan attempted to conduct a lawful traffic stop, the vehicle slowed but did not stop.  Not only did the vehicle refuse to stop for Officer Duncan, but also turned into an apartment complex to avoid another police vehicle blocking its way further down the street.  The area is known as a high crime area in the City of Chester.  After the stop, Officer Duncan learned through NCIC that the driver had a suspended license for DUI and the rear passenger had an active arrest warrant.  The court finds that these circumstances, when coupled with the fact that the stop was conducted in an area known for incidents of violent crime, certainly gave Officer Duncan reason to believe that [Dobson] could be armed such that Officer Duncan was permitted to conduct a pat-down search for officer safety.[12]

Dobson proceed to jury trial, at the conclusion of which he was convicted on all charges.  The trial court subsequently sentenced Dobson to an aggregate of six to fifteen years in prison.

In a divided memorandum, the Superior Court affirmed the denial of Dobson's suppression motion.  After summarizing the facts, the trial court proceedings, the standard of review, and the governing legal principles, the panel majority[13] noted particularly that, when assessing whether a suspect is armed and dangerous, "an overt threat by the

---

[11]    Trial Court Opinion—Suppression, 2/20/2020, at 7-8.

[12]    *Id.* at 7-8.

[13]    Senior Judge Pellegrini authored the majority memorandum, which was joined by Judge McLaughlin.

suspect or clear showing of a weapon is not required for a frisk."[14]  Further, the majority explained, the "officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or the safety of others was in danger."[15]

With those principles in hand, the majority first acknowledged that Officer Duncan did not observe Dobson act suspiciously in any way.[16]  Nonetheless, the panel held, the totality of the circumstances justified the officer's belief that Dobson was dangerous.  The panel identified five circumstances that, taken together, assertedly supported the pat-down.  First, "Officer Duncan was on routine patrol at nighttime when he responded to a report of shots fired" in a "high crime area."[17]  Second, within "a couple minutes" after the report of shots fired, Officer Duncan saw a sedan go through a red light one block away from the location from which the shots allegedly were fired.[18]  There were no other vehicles around at the time.  The time, proximity, and high-crime area led the officer to believe that the sedan "'could have been involved in the shooting."[19]  Third, rather than stop, the driver of the sedan (not Dobson) continued driving, albeit slowly, when Officer Duncan attempted to pull him over.[20]  Fourth, the sedan did not stop when the assisting officer blocked off Lloyd Street with his police cruiser, stopping instead in a parking lot.

---

[14]     *Commonwealth v. Dobson*, 2099 EDA 2021, 2022 WL 2311335, *4 (Pa. Super. June 28, 2022) (unpublished) (quoting *Commonwealth v. Mack*, 953 A.2d 587, 591 (Pa. Super. 2008)).

[15]     *Id.* (quoting *Commonwealth v. Cooper*, 994 A.2d 589, 592 (Pa. Super. 2010)).

[16]     *See id.*

[17]     *Id.*

[18]     *Id.* at *5.

[19]     *Id.* (quoting N.T. at 9, 13).

[20]     *See id*.

Although this was not erratic or dangerous driving, the panel nonetheless found it important, and indicative of dangerousness, opining this was the second time that the car refused to stop.[21]  Fifth, once the sedan did stop, the driver did not wait to be ordered out of the car.  Instead, the driver (not Dobson) immediately exited the car on his own initiative.  On top of that, the situation was "a nighttime vehicle stop."[22]  The majority emphasized that, while none of these factors created reasonable suspicion on its own, collectively they established a reasonable suspicion that Dobson was armed and dangerous.[23]

Judge (now Justice-Elect) McCaffery dissented.  In his view, Officer Duncan proffered no specific and articulable facts to warrant any belief, let alone a reasonable one, that Dobson was armed and dangerous.[24]  Judge McCaffery rehashed the facts as found to be credible by the trial court, and additionally observed that the report of gunshots did not involve a description of a vehicle.[25]  In other words, when Officer Duncan proceeded to the location, he was not searching for a particular make or model of a car that was believed to be involved in the shooting, or, indeed, any vehicle at all.  Instead, the officer was looking for "[s]hell casings, . . . struck vehicles, struck houses, [and] a victim."[26]  All that Officer Duncan observed was a car roll through a red light.  Nothing

---

[21]     *See id.*

[22]     *Id.* (citing *Commonwealth v. Zhahir*, 751 A.2d 1153, 1157 (Pa. 2000) (holding that the time of day when a stop occurs is relevant to a reasonable suspicion analysis)).

[23]     *See id.*

[24]     *Dobson*, 2022 WL 2311335, at *6 (McCaffery, J., dissenting).

[25]     *See id.*

[26]     *Id.* (quoting N.T. at 9).

about that traffic violation connected the sedan to the shooting. There wasn't even a high-speed chase. The car never traveled faster than approximately five miles per hour.[27]

Moreover, Judge McCaffery emphasized the lack of evidence that either Dobson or the backseat passenger was uncooperative, fidgety, nervous, or made any furtive movements at any time while the car was in motion or when parked during the interaction with police officers. To the contrary, Officer Duncan testified, while the driver exited the car, Dobson and the backseat passenger complied with all instructions, including the order to remain in the vehicle while the officers ran their names through the NCIC system. When asked to get out of the car, Dobson did so, giving no indication that he was armed or in any way dangerous. And, the two individuals that were arrested, the driver and backseat passenger, were arrested for non-violent crimes. Judge McCaffery discerned nothing in the record to indicate to a reasonable police officer that Dobson was violent, armed, or dangerous.[28]

Finally, Judge McCaffery stressed that, while the stop of the car was warranted, Dobson had nothing to do with the control of the car. He was merely a passenger and in no manner responsible for the actions undertaken by the driver of that car.[29] Absent any circumstances particular to Dobson that would give rise to a reasonable suspicion that he was armed and dangerous, all that remained was his presence in a high-crime area at 10:30 p.m. Judge McCaffery cautioned that "if we were to allow a pat-down of every person travelling in a vehicle in a high-crime area, the protections of the Fourth Amendment would be meaningless."[30]

---

[27]     See *id.*

[28]     See *id.* at *7.

[29]     See *id.*

[30]     *Id.*

## II.

The question in this case is whether Officer Duncan's decision to pat down Dobson was based upon a reasonable suspicion that Dobson was armed and dangerous. There is nothing exceptional or remarkable about this case. The two interesting aspects of the case, that Dobson was a passenger in a vehicle that led police on a brief, slow-speed chase and the concern for police officer safety, do not require us to break any new legal ground. Both are controlled by, or subsumed in, the well-established case law governing stop and frisks. In other words, this case requires nothing more than a straightforward application of the core dictates of *Terry v. Ohio*[31] and its progeny.

The Fourth Amendment to the United States Constitution states that "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . particularly describing the place to be searched, and the persons or things to be seized."[32] The touchstone of any Fourth Amendment analysis is "reasonableness."[33] The "general rule" is that reasonableness requires a demonstration of probable cause.[34] *Terry* is an exception—a "narrow"[35] one—to this general rule.

---

[31]  392 U.S. 1 (1968).

[32]  U.S. CONST. amend. IV. Similarly, the Pennsylvania Constitution states that "no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause . . . ." PA. CONST. art. I, § 8.

[33]  *Birchfield v. North Dakota*, 579 U.S. 438, 477 (2016).

[34]  *Dunaway v. New York*, 442 U.S. 200, 213 (1979).

[35]  *See Terry*, 392 U.S. at 27 (concluding that "there must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer").

In *Terry*, after observing three men act suspiciously, as if they were "casing a job," a police officer decided to investigate.[36]  Fearing that the men might be armed, the officer hastily approached the group and announced himself as a police officer.  When one of the men said something under his breath, the officer grabbed him, spun him around, and patted the outside of his clothing.  The pat-down revealed a firearm.[37]

The issue of whether the police officer's actions were constitutional made it all the way to the United States Supreme Court, which granted *certiorari* in the case in order to confront the "narrow question" of whether the police must "always" have probable cause for a police officer to conduct "a limited search for weapons."[38]  To answer this question, the Court was required to reconcile two opposing priorities:  a police officer's ability to safely address "rapidly unfolding and often dangerous situations" and the privacy interests protected by the Fourth Amendment.[39]  The Court determined that the "proper balance" of these interests resulted in a "narrowly drawn authority to permit a reasonable search for weapons *for the protection of the police officer*, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime."[40]  The Court emphasized that an officer in such a situation does not have to be "absolutely certain" that the suspect has a weapon.[41]  Instead, all that is necessary is the ability to demonstrate specific and articulable grounds that would lead a "reasonably prudent man in the circumstances" to

---

[36]     *Id.* at 6-7.

[37]     *See id.*

[38]     *Id.* at 15.

[39]     *Id.* at 10-11.

[40]     *Id.* at 27 (emphasis added).

[41]     *Id.*

believe that "*his safety* or that of others was in danger."[42]  Inasmuch as a *Terry* stop and frisk is "a serious intrusion upon the sanctity of the person,"[43] it cannot be predicated solely upon "unparticularized suspicion or hunch,"[44] but rather must emanate from "specific and articulable facts . . . , taken together with rational inferences from those facts."[45]

Ultimately, the Court held that:

> where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with *whom he is dealing may be armed and presently dangerous*, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where *nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area* to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.[46]

The Court's framing of its holding, as well as the language emphasized above attest to the fact that police officer safety was front and center in the Court's mind.  The protection of police officers from dangerous individuals or situations is built directly into *Terry*'s reasonable suspicion standard.  For this reason, *Terry* and its progeny readily suffice to resolve the case presently before our Court.  Nothing about the case *sub judice* requires this Court to create a new legal standard or to go beyond the careful balance

---

[42]    *Id.* (emphasis added; citations omitted).

[43]    *Id.* at 17; *see also id.* at 16 ("[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person.").

[44]    *Id.* at 27 (internal quotation marks and citation omitted).

[45]    *Id.* at 21 (footnote omitted).

[46]    *Id.* at 30 (emphasis added).

struck by the Supreme Court in *Terry*. Consideration for officer safety already is an essential and important part of the governing law.

While police officer safety was a weighty factor in *Terry*, the privacy rights of individuals detained by officers were of equal, if not paramount, concern for the Supreme Court. Because *Terry* authorized police action that constitutionally was permissible by a showing of less than probable cause, it stands as an exception to the general rule. It is not a broad exception. To the contrary, in the years since *Terry*, the Court "has been careful to maintain" the "narrow scope" of the exception.[47] A *Terry* stop and frisk is a "*sui generis* rubric of police conduct,"[48] not a "boundless law enforcement [tool] to be deployed at the whim or convenience of a police officer."[49]

Assessing the constitutionality of a *Terry* stop or frisk requires a "weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty."[50] "A central concern" in engaging in this evaluation is ensuring "that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field."[51] Thus, the Fourth Amendment requires that even the limited *Terry* stop or frisk be based on "specific, objective facts indicating that society's legitimate interests require the seizure of the particular individual."[52] In the absence of such neutral, demonstrable facts, "the balance between the public interest

---

[47] *Ybarra v. Illinois*, 444 U.S. 85, 93 (1979) (quoting *Dunaway*, 442 U.S. at 210).

[48] *Dunaway*, 442 U.S. at 209 (citations and internal quotation marks omitted).

[49] *Commonwealth v. Jackson*, 302 A.3d 737, 772 (Pa. 2023) (per curiam) (Wecht, J., Opinion in Support of Reversal).

[50] *Brown v. Texas*, 443 U.S. 47, 51 (1979) (citation omitted).

[51] *Id.* (citations omitted).

[52] *Id.* (citations omitted).

and [an individual's] right to personal security and privacy tilts in favor of freedom from police interference."[53]  "When [a frisk] is not based on objective criteria, the risk of arbitrary and abusive police practices exceeds tolerable limits."[54]

The determination of whether an individual poses a risk to a police officer, and, therefore, constitutionally may be subjected to a limited pat down, "must be based on commonsense [*sic*] judgments and inferences about human behavior."[55]  A court assessing the constitutionality of the frisk must take into account the fact that human experience and common sense teach us that armed and dangerous individuals act in a distinctive manner (perhaps by being evasive, fidgety, aggressive, furtive, nervous, etc.[56]) when confronted by police officers.  That said, a reviewing court also must acknowledge that a person who is not armed and dangerous would not be expected to act in that same suspicious manner.  While courts cannot demand that police officers operate with "scientific certainty,"[57] officers are required to weigh the totality of the circumstances, including "the presence of additional facts [that] might dispel reasonable suspicion."[58]

Reasonable suspicion must also be particularized to the individual that is being frisked.  That is because, as we explained in *Commonwealth v. Hicks*, the Fourth Amendment protects a "fundamentally individual right:"  the "right of each individual to be

---

[53]     *Id.* at 52.

[54]     *Id.* (citation omitted).

[55]     *Wardlow*, 528 U.S. at 125 (citing *Cortez*, 449 U.S. at 418).

[56]     *See id.* at 124 ("Our cases have also recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." (citations omitted)).

[57]     *Id.* at 125.

[58]     *Kansas v. Glover*, 589 U.S. ___, 140 S. Ct. 1183, 1191 (2020); *see also Interest of T.W.*, 261 A.3d 409, 429 (Pa. 2021) (Dougherty, J., concurring).

let alone."[59]   "[A] governmental intrusion upon that individual right requires an individualized justification; otherwise, a search or seizure is constitutionally unreasonable."[60]   The individualized "justification for a seizure is central to the *Terry* doctrine, inherent in the requirement that an investigative detention must be premised upon specific and articulable facts *particular* to the detained individual."[61]   Accordingly, a *Terry* frisk must be based upon the whole picture" and can proceed only when there exists a "particularized and objective basis" to believe that the "particular person" is armed and dangerous.[62]

Dobson's suggestion to the contrary notwithstanding, the Fourth Amendment's individualized suspicion requirement does not mean that only the suspect's actions are relevant to the overall assessment.   Were we to accept Dobson's framing of the *Terry* analysis, no action or statement by a third party could lend assistance to a police officer's assessment of a suspect's dangerousness.   That argument misapprehends and unjustifiably restricts the individualized suspicion requirement.

Individualized suspicion requires only that police officers (or, subsequently, reviewing courts) assess whether the totality of the relevant circumstances demonstrates that *this* particular individual has committed a crime, or that he or she is armed and dangerous.   The requirement prevents police officers from relying upon broad

---

[59]     *Commonwealth v. Hicks*, 208 A.3d 916, 937 (Pa. 2019) (quoting *Tehan v. U.S. ex rel. Shott*, 382 U.S. 406, 416 (1966)).

[60]     *Id.* (citing *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000) ("A search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing.")).

[61]     *Id.* at 938.

[62]     *Cortez*, 449 U.S. at 417; *see also In re D.M.*, 781 A.2d 1161, 1163 (Pa. 2001) (same).

generalizations that would permit seizures of any person who meets that generalization.[63] Moreover, the facts that the officer relies upon in forming an individualized suspicion can come from any source, not only from the suspect. Imagine that a police officer suspects, but is uncertain, that a man is about to rob the cashier at a convenience store. The officer notices that the man is holding a handgun. A woman sits calmly in a vehicle outside the store, bearing no weapon that is visible to the officer. The officer approaches and detains the man, who spontaneously blurts out that the woman in the vehicle masterminded the foiled robbery and that she forced him to participate at gunpoint. The officer would be justified to detain and to frisk the woman for his own safety. No one reasonably could argue that reasonable suspicion was lacking because none of the information that led to the belief that she was armed and dangerous derived from her own words or actions. In Dobson's view, the man's actions and statements would be entirely irrelevant to the question of whether the woman was armed and dangerous. *Terry* requires no such thing. Nor do any of *Terry*'s progeny. But *Terry* does require more than what transpired in the present case.

Thus, I turn to the specific question of whether Officer Duncan had reasonable suspicion to justify frisking Dobson for weapons. Recall that, when asked, Officer Duncan stated that the only reason that he believed Duncan to be dangerous was because they were in a high-crime area.[64] It would be easy enough to take Officer Duncan at his word

---

[63] It is precisely for this reason that this Court in *Hicks* rejected as unconstitutional a *per se* rule that had frequently been invoked by our lower courts that allowed police officers to treat any person concealing a weapon in public as criminally suspicious. *See Hicks*, 208 A.3d at 921.

[64] At oral argument for this case, it was quite reasonably suggested that, when Officer Duncan testified that he frisked Dobson because of "the area that we were currently in," N.T. at 19, he was referring not to the alleged high-crime character of the neighborhood, but instead to the fact that they were within close proximity to the area from which the "shots fired" call had emanated. Ultimately, it is a distinction without a difference, because (continued…)

and suppress the evidence under *Wardlow*.[65]  However, as a reviewing court, we are not to consider a particular police officer's stated reasons for his or her actions or subjective beliefs.  Instead, we are bound to consider the totality of the circumstances[66] from the "standpoint of an objectively reasonable police officer."[67]  Even viewed from that vantage point, there were no circumstances from which a reasonable officer could infer that Dobson was armed and dangerous.  Of course, as first year law students learn, the fact that Officer Duncan's initial hunch turned out later to be accurate is immaterial to this constitutional assessment.

As noted above, this inquiry is not limited to the actions and statements of the seized suspect.  Regardless of the source, when tallied, the body of information still must amount to specific and particularized grounds to believe that a suspect is armed and dangerous.  Here, in addition to Officer Duncan's description of the neighborhood as a high-crime area, both the trial court and the Superior Court relied extensively upon the actions and characteristics of the other two people in the sedan.  The problem here is that none of that information reasonably leads to any conclusions about Dobson, let alone the belief that he was armed and dangerous.

In its opinion denying Dobson's suppression motion, the trial court first noted that, shortly after the shots fired report, Officer Duncan watched the sedan roll though a red

---

either interpretation, on its own, is insufficient to create reasonable suspicion that Dobson, in particular, was armed and dangerous, or otherwise was in any way associated with the gunshots that Officer Duncan was investigating.

[65]     *Wardlow*, 528 U.S. at 124 (explaining that an "individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime").

[66]     *Commonwealth v. Holmes*, 14 A.3d 89, 96 (Pa. 2011).

[67]     *Commonwealth v. Chase*, 960 A.2d 108, 120 (Pa. 2008) (citing *Ornelas v. United States*, 517 U.S. 690, 696 (1996)).

light.[68]  The court acknowledged that Dobson was merely a passenger in the vehicle.  He was not in control of the vehicle, and the court made no effort to explain how or why being a passenger in a vehicle that committed a minor traffic violation contributed substantively to the reasonable suspicion calculus.  That is because no such inference can be drawn.  To do so would allow police officers to seize and frisk every occupant of a vehicle lawfully stopped for a traffic violation.  Nothing about a driver rolling through a red light leads a reasonable officer to believe that someone else in the car is committing a violent crime or carrying a weapon that could harm the officer.

In a similar vein, the trial court included within its assessment the fact that the driver did not stop the vehicle immediately when Officer Dobson initiated the stop, but instead continued driving until he turned into, and parked at, an apartment complex.  Once more, the trial court does not explain how these actions, indisputably undertaken exclusively by the driver, can be attributed to Dobson, the passenger, let alone how the driver's slow-speed evasion made Dobson dangerous to the officer.

The most perplexing aspect of the trial court's analysis is its reliance upon the fact that "Officer Duncan learned through NCIC that the driver had a suspended license for DUI and the rear passenger had an active arrest warrant."[69]   Nothing in the record suggests that either the DUI or the warrant for the rear passenger involved violence.  More importantly, the trial court did not elucidate at all how a driver's suspended license and a different passenger's arrest warrant reasonably (or even unreasonably) suggests that a third person (Dobson) was armed and dangerous.

Nonetheless, notwithstanding the lack of any nexus between the actions of the driver (or the rear passenger's arrest warrant) and Dobson, the trial court found that, in

---

[68]     Trial Court Opinion—Suppression, 2/20/2020, at 7-8.

[69]     *Id.* at 8.

conjunction with the high-crime area designation, the circumstances "certainly" created reasonable suspicion to conclude that Dobson "could be armed such that Officer Duncan was permitted to conduct a pat-down search for officer safety."[70] The trial court offered no record-based reason to believe that Dobson was armed and dangerous.

The Superior Court majority fared no better. In addition to the high-crime area designation, the panel majority noted that Officer Duncan saw a sedan travel through a red light one block away from the location from which the shots allegedly were fired. The panel emphasized that there were no other vehicles in the area and that the time, proximity, and area led the officer to believe that the sedan could have been involved in the shooting. Like the trial court, however, the intermediate panel did not explain how these general facts support the conclusion that a passenger in the vehicle was armed and dangerous. Aside from being located in the general vicinity of an unsubstantiated report, the vehicle exhibited no signs of being involved in the shooting. The vehicle was not speeding or moving in a manner suggesting it was fleeing a dangerous or violent incident. To the contrary, the vehicle rolled slowly through a red light and continued slowly to travel even after Officer Duncan attempted to stop it. The officer did not see any weapons, or see any of the vehicle's occupants discard anything from the vehicle, or act in a way that is consistent with being involved in a shooting. Simply put, aside from being in the vicinity of an alleged shooting, nothing about the initial moments of the interaction suggested that Dobson was in any way dangerous, or that he was involved in the alleged shooting.

Next, the panel majority found it relevant that the sedan continued driving, albeit slowly, when Officer Duncan attempted to pull it over. As in the trial court's analysis, this factor contributes nothing to the relevant assessment. Dobson was not the driver. He

---

[70] *Id.*

did not, and could not, control the movement of the vehicle. That the driver elected to proceed slowly to the apartment complex parking lot did not suggest that the passengers in that vehicle were armed and dangerous. In fact, it said nothing about the passengers at all.

Fourth, the panel majority relied upon the fact that the sedan also did not stop when the assisting officer blocked off Lloyd Street with his police cruiser, which was the second time that the car refused to stop. Once more, however, as Dobson was not driving the car, this factor shed no light on Dobson's purported dangerousness. The Superior Court did not attempt to explain how the driver's decisions made Dobson dangerous to Officer Duncan.

Finally, the panel majority pointed to the fact that, once the sedan did stop, the driver did not wait to be ordered out of the car. Instead, the driver immediately exited the car without being asked to do so.[71] As with the other circumstances relied upon, the Superior Court does not explain how the driver's decision to get out of the car before being asked to do so rendered reasonable a conclusion that someone else in the car is armed and dangerous. Notably, the driver exited calmly and was otherwise compliant with the officers. He did not exhibit any behaviors indicative of aggressiveness or dangerousness. The record contains no evidence suggesting that the driver's actions in any manner endangered the police officers on the scene, let alone in a way that would make it reasonable to conclude that anyone else in the vehicle also was armed or dangerous. Nor did the panel explain how the fact that the driver stepped out of the vehicle voluntarily served to convert the stop into something more dangerous to the officers.

---

[71]    *Dobson*, 2022 WL 2311335, at *5.

The trial court and the Superior Court both made the same critical mistake. Both overstressed the circumstances particular to the others in the vehicle. Neither court attempted logically to link those facts to a reasonable, particular, and individualized belief that Dobson was armed and dangerous. Moreover, the lower courts did not consider the "whole picture,"[72] including "the presence of additional facts [that] might dispel reasonable suspicion."[73] For instance, those courts failed to account for the fact that the vehicle exhibited no actual signs of being involved the alleged shooting. The vehicle was not traveling in a recklessly fast manner, as would be indicative of a vehicle fleeing a violent crime. To the contrary, the vehicle at all times proceeded slowly until it came to a stop in the apartment complex. Officer Duncan did not testify that the vehicle was being operated in a hazardous or dodgy way, nor did he see anything being discarded from either side of the vehicle.

Once the driver stepped out of the vehicle, there was still no evidence of dangerous or aggressive behavior. The driver was responsive and compliant, and gave no indication that the officers were in danger. The same is true for Dobson and the backseat passenger. Both waited in the vehicle while Officer Duncan ran their information though NCIC, complied fully with the officers' commands, and answered the officers' questions. Neither acted furtively, nervously, or in an agitated manner. Neither made sudden or evasive movements, nor did either attempt to secrete anything in or outside the vehicle. To the "objectively reasonable police officer,"[74] Dobson was a peaceful, passive, and compliant passenger in a vehicle that committed a non-violent traffic violation before

---

[72]    *Cortez*, 449 U.S. at 417; *see also D.M.*, 781 A.2d at 1163.

[73]    *Glover*, 589 U.S. at ___, 140 S. Ct. at 1191; *see also Interest of T.W.*, 261 A.3d at 429 (Dougherty, J., concurring).

[74]    *Chase*, 960 A.2d at 120 (citation omitted).

midnight in a high-crime area. Nothing about these indisputable facts should cause a trained, objectively reasonable officer to believe that Dobson was armed and dangerous.

The consequences of the lower court's decisions are severe. The ruling here allows police officers to conclude automatically that any nighttime stop in a high-crime area for a traffic violation allows officers to seize and frisk each and every occupant of the vehicle. A couple who drives in the City of Chester after a dinner date is at risk of being frisked if the driver accidentally rolls through a stop sign. Carpoolers on their way home from an evening shift who pass through a high-crime area can be frisked if the driver forgets to use a turn signal. As I stated recently in *Jackson*, courts that fail to restrict overbroad applications of the stop and frisk doctrine "push[] the *Terry* stop far beyond what the Supreme Court of the United States intended it to be: a limited exception to the requirement that police officers must have probable cause before arresting an individual."[75] The "sweeping law enforcement tool" that the lower courts endorsed in today's case "would be unrecognizable to the Justices that decided *Terry* in 1968. Our Constitutions do not permit such expansive police power."[76]

The only substantive factor that militates in favor of reasonable suspicion here is the high-crime area designation, *i.e.*, the only factor that Officer Duncan actually cited to justify his actions. Thus, I return to where I began this opinion, with the Supreme Court's direction that an "individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime."[77] Dobson was a passenger in a car traveling in a so-called high-

---

[75] *Jackson*, 302 A.3d at 769 (Wecht, J., Opinion in Support of Reversal).

[76] *Id.*

[77] *Wardlow*, 528 U.S. at 124 (citing *Brown*, 443 U.S. at 52 ("The fact that appellant was in neighborhood frequented by drug users, standing alone, is not a basis for concluding that appellant himself was engaged in criminal conduct.")).

crime area.  Nothing more.  That is not constitutionally sufficient for police officers or judges to consider him to be armed and dangerous.  The Superior Court's contrary ruling should be reversed.

### III.

Although a reviewing court is required to consider the totality of the circumstances, and not just the actual reason proffered by the police officer who effectuated the seizure or the frisk, this case shines a light on the proliferation of the practice of using a high-crime area designation as the sole basis for stopping and frisking people on the street. In other words, it appears that some harbor a belief that a person's mere presence within the blurred and amorphous boundaries of a so-called high-crime area suffices to create reasonable suspicion or probable cause.  It is well-past time for this Court to quash this misguided belief.  Moreover, the time to reconsider whether the high-crime area designation—which is often invoked in quasi-totemic fashion and supported by nothing more than a bald assertion by an individual police officer—is a relevant constitutional factor in our search and seizure analysis is long overdue.

Since at least 1972,[78] the high-crime area designation has become a mainstay of American search and seizure jurisprudence.[79]  There are (at least) two significant problems with allowing this designation, in its current form, to inform search and seizure decisions..  First, no objective standards exist for courts to apply when deciding whether an area warrants the designation, nor are there any burdens of proof or persuasion that

---

[78]     *See Adams v. Williams*, 407 U.S. 143, 144 (1972) (noting that the fact that a traffic stop occurred in a high-crime area was a relevant contextual consideration in a *Terry* analysis).

[79]     *See*, *e.g.*, *D.M.*, 781 A.2d at 1164 (holding that unprovoked flight in a high-crime area was sufficient to establish reasonable suspicion); *Commonwealth v. Thompson*, 985 A.2d 928, 936 (Pa. 2009) (considering the constitutionality of an arrest of an individual observed engaging in a hand-to-hand transaction of an unknown object in a high-crime area).

the Commonwealth must satisfy. Until a time comes when either the United States Supreme Court or this Court abolishes the practice of relying upon this factor, there must be some reasonable prerequisites for admissibility. All that presently is necessary is the presence of a police officer on the witness stand "who will utter the words."[80] If the practice of invoking this rote moniker as a factor justifying a seizure or a pat-down must persist, then I agree with Justice Donohue's proposition in *Jackson* that, at a minimum, "the Commonwealth must present evidence to support its assertion of the designation," in order to elevate that designation above the level of "meaningless" or "hollow" "incantations."[81] Before a court should credit the portrayal of a neighborhood in this manner, the testifying officer should provide the court with empirical data that would allow the court to reach an objective determination about the nature of a particular area.[82] I also agree with Justice Donohue that merely proving that an area is indeed a "disproportionately crime-ridden neighborhood"[83] is not enough. The Commonwealth also must demonstrate that the criminal activity that frequently occurs in the area was relevant to the officer's suspicion in the case.[84] For instance, that a neighborhood is known for drug activity is irrelevant to a police officer's suspicion that a person is driving under the influence of alcohol.

However, I would expend no judicial resources in attempting to craft any such standards. This is because of the second, and more significant, problem with relying in any way upon a police officer's characterization of a locale as a high-crime area: such

---

[80]     *Jackson*, 302 A.3d at 757 (Donohue, J., Opinion in Support of Reversal).

[81]     *Id.*

[82]     *See id.*

[83]     *Id.* at 757.

[84]     *See id.* at 758.

reliance by the officer and by a reviewing court violates our Constitutions. Even the most definitive crime statistics should not justify inclusion of this factor in assessing the constitutionality of police action. Most notably, the blanket assertion that an area is a high-crime area contravenes the requirement that reasonable suspicion (or probable cause) be particular to the individual suspect.[85] Relying upon the designation of a neighborhood as a high-crime area necessarily means that factors contributing to reasonable suspicion begin to accrue against every person in that neighborhood as soon as that police officer starts his or her shift. As I stated in *Commonwealth v. Galloway*:

> general designations of neighborhoods as high crime areas seems to have become a box-checking heuristic for law enforcement in search-and-seizure cases. While designating localized portions of an area as prone to criminal activity may be one thing, labeling an entire major city in that way is another thing altogether. To the extent that tagging neighborhoods, much less entire cities and interstate thoroughfares, as high crime has become rote in the suppression context, it undermines the requirements of individualized suspicion and disserves the millions of law-abiding citizens who live in and travel to and from those places, who are no less entitled to the Constitution's protections because of that unfortunate statistical circumstance, the standards for which we have never defined. We would do well to dissuade law enforcement from depending too much on such amorphous characteristics. Stated otherwise, and just as concerning, relying upon such a premise means that probable cause or reasonable suspicion begins to tally against each and every person who steps foot in [such an area], whether for leisure, business, or residency, simply by being present, which erodes the requirement of individualized suspicion.[86]

The presence or quality of constitutional rights cannot depend upon the quality or crime-free character of an area. As the late Judge Eugene Strassburger stated, "[p]eople who live in poor areas that are riddled with crime do not have fewer constitutional rights

---

[85]    *See Hicks*, 208 A.3d at 938.

[86]    284 A.3d 870, 875 (Pa. 2022) (per curiam) (Wecht, J., dissenting) (internal quotation marks, citation, and parentheticals omitted).

than people who have the means to live in 'nice' neighborhoods."[87]  The late Chief Justice

Baer echoed these concerns:

> I cannot concur that the "high-crime" nature of the neighborhood is a relevant factor.
>
> *     *     *
>
> The unfortunate result of today's decision is that the low socio-economic character of a neighborhood will now be enough to suffice the rigorous standards of probable cause for any citizen, not just the street-level heroin dealer.  While I understand that, in the social norms of today's world, drug transactions may occur more often in neighborhoods such as the one here, the rights of Pennsylvania residents in both high-crime and low-crime areas remain the same under our Constitution.  To be sure, if police can now use evidence of the high-crime nature of the neighborhood to demonstrate probable cause, then the simple action of shaking a friend's hand upon greeting will subject those friends potentially to being searched and seized, while the same occurrence in a low-crime area will not.  Such a conclusion is patently offensive to our longstanding constitutional principles protecting every person in our society from intrusive action by the state, even in the face of an ever-increasing drug problem on our streets.
>
> I fully realize that a drug transfer in this case could have occurred, and that probable cause does not require absolute certainty.  Nevertheless, the regrettable outcome of this decision places the deciding factor in a case, not on the perceived action, but rather on the location of that action.  Again, while an arresting officer may be proved correct in his hunch, such is not an accepted constitutional norm.[88]

The present case proves the late Chief Justice correct.  Location continues to

matter more than the actions of the suspect.  Worse, we continue to find this to be an

"accepted" constitutional practice in suppression cases.[89]  We should rethink this

---

[87]  *Commonwealth v. Barr*, 240 A.3d 1263, 1291 (Pa. Super. 2020) (Strassburger, J., concurring), *rev'd on other grounds by* 266 A.3d 25 (Pa. 2021).

[88]  *Commonwealth v. Thompson*, 985 A.2d at 943-44 (Baer, J., concurring) (internal quotation marks, citations, and parentheticals omitted).

[89]  *Id.* at 944.

troubling aspect of search and seizure jurisprudence, beginning with the case before us today.